1

2

3

4

5

6

7

8
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10   Indian Harbor Insurance Company,                 CASE NO. C09-1120 RSM

11                          Plaintiff,               ORDER GRANTING IN PART
                                                     PLAINTIFFS MOTION FOR
12            v.                                     SUMMARY JUDGMENT

13   Transform LLC, Equilateral Holdings
     LLC, East AHM LLC, Hansell Mitzel
14   LLC

15                          Defendant.

16                                    **I.      INTRODUCTION**

17         This matter comes before the Court on Plaintiff Indian Harbor Insurance Company's (IH)

18   motion for summary judgment. (Dkt. #20).  On August 6, 2009, IH filed a complaint requesting a

19   declaratory judgment that it owes no obligation–neither duty to defend nor duty to pay any

20   judgment–to its insured, defendant Transform LLC.  IH moved for summary judgment on

21   February 18, 2010.  This Court heard oral argument on July 30, 2010.  For the reasons set forth

22   below, the Court GRANTS IN PART and DENIES IN PART Plaintiffs motion.

23

24

## II.   BACKGROUND

From February 13, 2008, to February 13, 2009, IH insured Transform LLC (doing business as Equilateral Holdings) under a commercial general liability (CGL) policy for damages resulting from bodily injury or property damage.  The policy is subject to numerous exclusions, some of which deny coverage for the insured's own product or work, impaired property not physically injured, or recall of defective products.

In June 2008, Transform contracted with defendant East AHM LLC and Hansell Mitzel LLC (AHM) to construct 55 modular condominium units (modules) to be incorporated into the Trailhead Condominiums in Cle Elum, Washington.  The construction contract included various terms and conditions, a warranty provision, and a contract limitation period for claims or causes of action.  The warranty provision guaranteed the modules would be free from defects.  Transform promised to "promptly repair or replace, as necessary, any defect in workmanship or materials for which it was responsible." (Dkt. #20-2 at 87).  The parties agreed that this would be the exclusive remedy for any losses or damages AHM incurred.  The contract also required any claims or causes of action to be brought by AHM within 18 months of delivery of the goods.

AHM purchased and supplied all materials Transform used to build the modules.  Delivery of the modules began around September 5, 2008, continuing until October 20, 2008.  AHM had constructed the building foundation and underground parking structure by first delivery.  Once the modules arrived, they were placed into the existing structure and "knitted" together.  Plumbing, heat, water, electrical, etc., were connected between the modules.  AHM could not test the modules for deficiencies until the modules were installed and connected.  AHM also built lobbies, stair towers, an elevator shaft, and other common areas around the modules.  After this and further finishing work (doors, trim, paint, etc.), the units were "energized."

1  At this point, AHM alleges it discovered all Transform's modules were defective, with systemic

2  electrical, structural, and plumbing problems.[1]  Circuits shorted out and many other problems

3  arose.  The existing structure was also damaged by water from leaking pipes.

4       Once AHM discovered the defects, it notified Transform that it would need the modules

5  repaired and replaced according to the terms of the construction contract.  AHM states that

6  Transform made an initial evaluation, but eventually notified AHM it would be unable to repair

7  the defects so it was breaching the construction contract warranty provision.  AHM was left

8  responsible for fixing the defects and resulting damage.  As a result, AHM had to tear out much

9  of the existing structures, finishing work, and modules, damaging its own work in the process.

10      AHM filed a notice of claim under the insurance policy, alleging all Transform's modules

11 were defective and AHM had to rebuild.  IH commenced investigation of the claim.  Following

12 its investigation, IH made an initial determination of non-coverage based in part on the

13 exclusions of the IH insurance policy.  IH explained it would continue to investigate the claim

14 under a full reservation of rights, and requested information from Transform to support finding

15 coverage.  Transform did not respond.

16      On August 6, 2009, IH filed a complaint against Transform and AHM with this Court

17 requesting declaratory judgment to determine its legal obligation to Transform.  IH has now

18 moved for summary judgment.  Transform has not responded to this suit.

19

20 _____

21     [1] The module defects are disputed in the underlying state lawsuit. However, for purposes
   of this summary judgment motion, we determine a duty to defend based on allegations in the
22 complaint against the insured. *Holland Am. Ins. Co. v. Nat'l Indem. Co.*, 75 Wn.2d 909, 911
   (1969). "[A]n insurer's duty to defend an action brought against its insured arises when a
23 complaint against the insured, construed liberally, alleges fact which could, if proven, impose
   liability upon the insured's within the policy's coverage." *Unigard Ins. Co. v. Leven*, 97 Wn. App.
24 417, 425 (1999).

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 3

1  On February 24, 2010, AHM filed a complaint in Skagit County Superior Court against

2  Transform.  AHM alleges, *inter alia*, that Transform caused property damage to the materials

3  purchased and supplied by AHM, along with delay and property damages arising from the

4  defective modules.  AHM claims that Transform breached its promise to repair and replace the

5  defective products promptly.  Transform responded to the state suit, and IH is currently

6  defending under a reservation of rights.

7  **III.    STANDARD OF REVIEW**

8  Summary judgment is appropriate where "the pleadings, the discovery and disclosure

9  materials on file, and any affidavits show that there is no genuine issue as to any material fact

10  and that the movant is entitled to judgment as a matter of law." FRCP 56(c); *Anderson v. Liberty*

11  *Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The Court must draw all reasonable inferences in favor

12  of the non-moving party.  *See F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir.

13  1992), *rev'd on other grounds*, 512 U.S. 79 (1994).  The moving party has the burden of

14  demonstrating the absence of a genuine issue of material fact for trial.  *See Anderson*, 477 U.S. at

15  257.

16  Genuine factual issues are those for which the evidence is such that "a reasonable jury

17  could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.  Material facts are

18  those which might affect the outcome of the suit under governing law. *Id.*  In ruling on summary

19  judgment, a court does not weigh evidence, but "only determine[s] whether there is a genuine

20  issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *O'Melveny &*

21  *Meyers*, 969 F.2d at 747).

22  **IV.    ANALYSIS**

23

24

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 4

Under the insurance policy, IH will pay for sums Transform becomes legally obligated to pay as a result of "bodily injury" or "property damage" caused by an "occurrence." (Dkt. #20-2 at 16). This general policy language is subject to numerous exclusions, four of which are disputed in this case. These four exclusions bar coverage for "Damage to Your Product," "Damage to Your Work," "Damage to Impaired Property or Property Not Physically Injured," and "Recall of Products, Work or Impaired Property." (Dkt. #20-2 at 20).

There are multiple types of damages disputed: repair and replacement of Transform's defective modules, damage to materials supplied by AHM to Transform for module manufacture, rip and tear damage to AHM's own sound construction, and delay damages.

IH argues it is entitled to summary judgment, because (1) the damages AHM seeks are not recoverable under the construction contract; (2) the damages are not covered or are excluded by the insurance policy; and (3) the state court suit was not commenced within the contract limitation period. Before addressing each of these arguments in turn, the Court addresses whether it should exercise its discretion to decide this declaratory action.

**A. Declaratory Judgment Action**

Defendant AHM alleges that granting declaratory judgment in favor of IH may prejudice the underlying state lawsuit between AHM and Transform. AHM requests that the Court stay this proceeding.

This Court has discretion to declare the rights and other legal relations of a party seeking declaratory judgment in a "case of actual controversy." Declaratory Judgment Act, 28 U.S.C. § 2201(a) (1934). Washington courts have consistently allowed insurers to seek declaratory judgment to determine their legal obligations to defend or indemnify their insured when there is a continuing underlying liability action. *Atlantic Cas. Ins. Co. v. Oregon Mut. Ins. Co.*, 137 Wn.

1  App. 296, 306-07 (2007) (citing *Truck Ins. Exch. v. Vanport Homes, Inc.*, 147 Wn.2d 751, 761

2  (2002)).  *See also National Indem. Co. v. Smith-Gandy, Inc.*, 50 Wn.2d 124, 128 (1957).

3       Washington courts have recognized that "courts have the power to determine questions of

4  fact when necessary or incidental to the declaration of legal relations." *Trinity Universal Ins. Co.*

5  *v. Willrich*, 13 Wn.2d 263, 268 (1942) (citing cases).  Insurance policy interpretation is a

6  question of law. *Overton v. Consolidated Ins. Co.*, 145 Wn.2d 417, 424 (2002).  Furthermore,

7  IH's duty to defend is determined by facts alleged in AHM's complaint against Transform.

8  *Holland Am.*, 75 Wn.2d at 911.  The Court does not need to decide any underlying facts, so there

9  is no potential prejudice to Transform.  Thus, it is proper for this Court to determine IH's legal

10  obligation based on its insurance policy.

11  **B.  Construction Contract Dispute**

12       The parties dispute the meaning of section 5 of the construction contract between AHM

13  and Transform. Section 5 provides:

14       **Warranty.** Seller warrants that the goods furnished hereunder will be free
         from defects in materials and workmanship for a period of one year from their date
15       of delivery to Buyer . . . Seller agrees to promptly repair or replace, as necessary,
         any defect in workmanship or materials for which it is responsible. Seller shall
16       transfer any warranty available and transferable from the original manufacture of
         component parts of the goods to the Buyer. **THIS REMEDY IS THE**
17       **EXCLUSIVE REMEDY FOR ANY BREACH BY SELLER.**

18       **THE FOREGOING WARRANTY IS IN LIEU OF ALL OTHER**
         **WARRANTIES, EXPRESS OR IMPLIED . . . THE BUYER'S EXCLUSIVE**
19       **REMEDY WITH RESPECT TO ANY AND ALL LOSSES OR DAMAGES**
         **RESULTING FROM ANY CAUSE WHATSOEVER SHALL BE REPAIR**
20       **AND REPLACEMENT AS SPECIFIED ABOVE. IN NO EVENT SHALL**
         **THE SELLER BE LIABLE FOR ANY CONSEQUENTIAL DAMAGES OF**
21       **ANY NATURE, INCLUDING WITHOUT LIMITATION, DAMAGES FOR**
         **DELAYS, PERSONAL INJURY, OR DAMAGE TO PROPERTY,**
22       **WHETHER ALLEGED OR RESULTING FROM BREACH OF**
         **WARRANTY OR CONTRACT BY SELLER OR NEGLIGENCE OF**
23       **SELLER OR OTHERWISE.** (Dkt. #20-2 at 87).

24

IH contends that the contract's plain language bars recovery for any rip and tear or delay damages because they are "consequential." On the other hand, AHM contends that these damages are recoverable because they arose directly from the defective modules, which Transform failed to "promptly repair and replace." AHM argues that it would be impossible to repair or replace the defective modules without ripping out AHM's own nondefective work.

Although the issue of what damages AHM may recover from Transform under the construction contract is the central dispute in the underlying state lawsuit, IH urges this Court to interpret the contract as a question of law. However, Washington courts use the "context rule" as an "analytic framework for interpreting written contract language." *Berg v. Hudesman*, 115 Wn.2d 657, 667 (1990). This means Washington courts admit extrinsic evidence to interpret the "entire circumstances under which the contract was made." *Id.* This rule requires viewing a contract as a whole, including "all the circumstances surrounding the making of the contract [and] the subsequent acts and conduct of the parties to the contract." *Id.* Courts may look to the parties' prior course of dealing to interpret a contract's meaning. *Id.* at 668.

At oral argument, counsel for AHM warranted that Transform and AHM had a history of prior dealing, and in the past interpreted "repair and replace" to include AHM's work around any of Transform's defective workmanship. Material facts are those that might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248. If both Transform and AHM understood the construction contract to include rip and tear damages, this could affect the outcome of the state suit. Because this is a factual issue in the underlying state lawsuit, it would be better and more efficiently decided by the state court. Therefore, the court declines to interpret the construction contract.

**C. Insurance Policy Dispute**

1    To determine whether disputed damages are covered under a CGL insurance policy, the

2    Court considers (1) whether the alleged damages constitute "property damage," (2) whether there

3    was an "occurrence" that gave rise to the property damages, and (3) whether the property damages

4    are barred by specific policy exclusions. *Dewitt Const. Inc. v. Charter Oak Fire Ins. Co.*, 307

5    F.3d 1127, 1133 (9th Cir. 2002).  The damages disputed in this action are: repair and

6    replacement of Transform's defective modules, damages to the materials supplied by AHM to

7    Transform, rip and tear damages to AHM's own construction, and delay damages.

8    Insurance policy interpretation is a question of law. *Overton*, 145 Wn.2d at 424.  Courts

9    interpreting contracts like insurance policies first try to determine the parties' intent. *Greer v.*

10   *Northwestern Nat'l Ins. Co.*, 109 Wn.2d 191, 197 (1987).  Clear, unambiguous policy language

11   is interpreted according to its plain meaning and as an average purchaser would understand the

12   policy. *Aetna Cas. & Sur. Co. v. M & S Indus.*, 64 Wn. App. 916, 921 (1992).  When

13   determining whether an insurer has a duty to defend or indemnify, the Court looks first to the

14   insurance policy to determine if the alleged damage is "conceivably covered." *Hayden v. Mutual of*

15   *Enumclaw Ins. Co.*, 141 Wn.2d 55, 64 (2000).  If the alleged damage falls within the scope of the

16   coverage, the Court then determines if policy exclusions bar coverage. *Id.*  Insurance policy

17   exclusions are strictly construed in favor of finding coverage for the insured. *Id*; s*ee also M & S*

18   *Indus.*, 64 Wn. App. at 923.

19       1.   General Policy Language: "Property Damage" and "Occurrence"

20

21

22

23

24

The Court first determines what damages are covered under the general policy language. In this section, the Court discusses whether AHM's rip and tear damages fall within the general policy language.[2]

The insurance policy stipulates that IH is only responsible for "property damage" caused by an "occurrence." (Dkt. #20-2 at 16).  The parties do not dispute that third party damage resulting from an insured's defective product constitutes "property damage" under Washington law. *See Baugh Const. Co. v. Mission Ins. Co.*, 836 F.2d 1164, 1167 (9th Cir. 1988); *Dewitt*, 307 F.3d at 1134; *M & S Indus.*, 64 Wn. App. at 923.

The parties contest whether the damage to AHM's work is an "occurrence" within the terms of the insurance policy.  Occurrence is defined in the contract as "an accident, including continuous or repeated exposure to substantially the same harmful conditions." (Dkt. #20-2 at 28). Accident is not defined in the policy.  *Black's Law Dictionary* defines "accident" as "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated." 15 (7th ed. 1999).

Pure workmanship defects are not considered accidents or "occurrences," since CGL policies are not meant to be performance bonds or product liability insurance. *Mutual of Enumclaw Ins. Co. v. Patrick Archer Const., Inc.*, 123 Wn. App. 728, 733 (2004); *see also M & S Indus.*, 64 Wn. App. at 922.  On the other hand, damages arising from workmanship defects can give rise to an "occurrence."  The Court looks to the "kind of losses" resulting from defective construction to determine if the property damage constitutes an "occurrence." *Yakima Cement Products Co. v. Great Am. Ins. Co.*, 93 Wn.2d 210, 217 (1980) ("defective manufacture of

---

[2] The Court need not decide whether the other alleged damages are covered by the general policy language because, as discussed below, the Court concludes they are barred by exclusions. *See infra* Part IV.C.2.

1  concrete panels, [that] necessitate[ed] their removal, refabrication, and repair constitute[d] an

2  'accident' and thus an 'occurrence'). Washington courts construe 'accident' and 'occurrence' broadly

3  in favor of finding coverage for the insured. *Yakima Cement*, 93 Wn.2d at 216-17.

4        AHM's third party property damage resulting from defective workmanship amounts to an

5  'occurrence' under the terms of the policy. *Yakima Cement*, 93 Wn.2d at 217.  Contrary to IH's

6  argument, the existence of an 'occurrence' is not determined by whether the action is for breach of

7  contract or negligent manufacture. An 'occurrence' under Washington law includes the 'deliberate

8  manufacture of a product which inadvertently is mismanufactured.' *Id.* at 215. Likewise, the

9  Ninth Circuit relying on *Yakima Cement* held that a subcontractor's 'unintentional mismanufacture'

10  of concrete piles that caused third party property damage constituted an 'occurrence' under a CGL

11  policy. *Dewitt*, 307 F.3d at 1133.  Whether there is an 'occurrence' depends on whether the

12  mismanufacture was unintentional rather than intentional, not on whether the action is for

13  negligence or breach of contract.  *See Mid-Continent Cas. Co v. Titan Const. Corp.*, 281

14  Fed.Appx. 766, 768 (9th Cir. 2008) (finding occurrence in action for breach of a contract

15  warranty provision resulting from negligent mismanufacture).  This corresponds to 'accident'

16  defined as an 'unintended and unforeseen injurious occurrence.' *Black's Law Dictionary* 15 (7th

17  ed. 1999).  Because, as alleged, Transform breached the contract warranty provision by

18  providing inadvertently defective products to AHM, there was an 'occurrence.' Thus, AHM's rip

19  and tear damages fall within the general scope of coverage.

20        2.  'Your Product' Exclusion

21        After analyzing the scope of general liability coverage, the Court next considers if

22  coverage is barred by any policy exclusions. *Dewitt*, 307 F.3d at 1133.  Exclusions are strictly

23  construed in favor of finding coverage for the insured. *Diamaco*, 97 Wn. App. at 338-44.  IH

24

1   contends that the damages alleged are barred by Exclusion K, "Damage to Your Product," which

2   bars coverage for "property damage" to "your product" arising out of it or any part of it." (Dkt. #20-2

3   at 19).  The policy stipulates that both Transform's "product" and "work" are the "manufacturing of

4   modular built structures." *Id.* at 30.

5        The IH insurance policy defines "your product" as "any goods or products, other than real

6   property, manufactured, sold, handled, distributed or disposed of by[3] Transform, and includes

7   "materials, parts or equipment furnished in connection with such goods or products." (Dkt. #20-2

8   at 29).  Washington courts have interpreted this broad definition to mean "goods which are

9   processed or assembled in the ordinary channels of commerce" and those "in which the insured

10   trades or deals." *Patrick Archer*, 123 Wn. App. at 733; *Olympic S.S. Co., Inc. v. Centennial Ins.*

11   *Co.*, 117 Wn.2d 37, 49-50 (1991).  Likewise, "handled" under a CGL policy means "to buy, sell,

12   distribute, or trade in." *Olympic S.S.*, 117 Wn.2d at 50-51 (not "handling" within the terms of the

13   exclusion where a company merely affixed labels to cans).

14        The parties fail to cite any controlling Washington cases where third-party materials

15   supplied to a manufacturer were damaged.  However, the Court finds *Peterson v. Dakota*

16   *Molding* persuasive. 738 N.W.2d 501, 507-08 (N.D. 2007).  There Peterson supplied all

17   materials but one plastic portion for Dakota Molding to manufacture a funnel. *Id.*  Peterson

18   alleged that all these materials were damaged when the funnels turned out to be defective. *Id.*

19   Coverage for this type of damage was barred by the "your product" and "your work" exclusions,

20   because Dakota Molding's "product and work involved not only providing the plastic portion of

21   the funnel, but also the manufacturing of the completed funnel product, and consequently

22   ————————————————

23        [3] Contrary to AHM's contention, the "real property" exclusion of "your product" is not
applicable here. As components of a larger structure, Transform's modules and the materials used

24   to construct them do not constitute "real property."

1   included any materials, parts or equipment furnished in connection with its goods or products or

2   with its work or operations." *Id.* at 509.

3        AHM supplied all the materials Transform used to construct the modules.  AHM claims

4   these materials were damaged because there were screws in the pipes, and the modules had to be

5   torn out and replaced because they were so defective.  Once Transform received the materials

6   and used them to manufacture the modules, they became components of Transform's "product,"

7   "manufactured, sold, handled, [and] distributed" by Transform. (Dkt. #20-2 at 29); *Peterson*, 738

8   N.W.2d at 507-08; *Patrick Archer*, 123 Wn. App. at 733. Manufacturing modules is the business

9   in which Transform "trades or deals." *Patrick Archer*, 123 Wn. App. at 733.  Furthermore, the

10   materials used to create the modules were "handled" by Transform, because they were used in the

11   distribution and trade of the modules. *Olympic S.S.*, 117 Wn.2d at 51.  Thus, both the finished

12   modules and the materials supplied to Transform for manufacture are the "product" of Transform.

13   IH owes no duty to indemnify Transform for damages to these products.

14        In contrast, damage to AHM's own work falls outside the exclusion because it is not the

15   "product" of Transform. *See M & S Indus.*, 64 Wn. App. at 925-26 (coverage present where

16   "defective product causes damage to another person's tangible property"); *Dewitt*, 307 F.3d at 1133

17   ("there must be property damage separate from the defective product itself").[4]

18        3.   "Impaired Property" Exclusion

19

20   _____

21       [4] The Court declines to reach Exclusion L, "Damage to Your Work," for two reasons. First,
   since Transform's "product" and "work" are the same, the "your work" exclusion (if applicable) would
22   bar coverage for Transform's modules and materials supplied to Transform. These are already
   barred under the "your product" exclusion. Second, there is a dispute whether Transform used
23   subcontractors to perform its contract obligations, which would make the exclusion inapplicable.
   The Court cannot determine as a matter of law whether subcontractors were used or not, so it
24   further declines to reach Exclusion L.

1    The parties dispute whether Exclusion M, "Damage to Impaired Property or Property Not

2  Physically Injured," bars coverage for AHM's damages. The exclusion and definition are:

3         "Property damage" to "impaired property" or property that has not been physically
          injured, arising out of:
4         (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or
              "your work"; or
5         (2) A delay or failure by you or anyone acting on your behalf to perform a
              contract or agreement in accordance with its terms.
6
          Impaired property means tangible property, other than "your product" or "your work",
7         that cannot be used or is less useful because:
          a.   It incorporates "your product" or "your work" that is known to be defective,
8              deficient, inadequate or dangerous; or
          b.   You have failed to fulfill the terms of a contract or agreement;
9         if such property can be restored to use by:
          a.   The repair, replacement, adjustment or removal of "your product" or "your work";
10             or
          b.   Your fulfilling the terms of the contract or agreement. (Dkt. #20-2 at 20, 27).
11

12  IH argues that this exclusion "bar[s] coverage for 'loss of use' claims (1) when the loss was caused

13  by the insured's poor workmanship or faulty materials; and (2) when there has been no physical

14  injury to property other than the insured's work itself." (Dkt # 20-1 at 20, citing *Transcontinental*

15  *Ins. Co. v. Ice Sys. of Am., Inc.*, 847 F. Supp. 947, 950 (M.D. Fla. 1994); *Kvaerner Metals Div. v.*

16  *Commercial Union Ins. Co.*, 825 A.2d 641, 655 (Pa. Super. Ct., 2003).

17    Washington courts interpret "impaired property" exclusions like the one at issue here to bar

18  coverage for economic or "loss of use" claims. *Hayden*, 141 Wn.2d at 65-66; *Vanport Homes*, 147

19  Wn.2d at 762.  Impaired property exclusions do not apply when there is physical injury to

20  tangible property. *Vanport Homes*, 147 Wn.2d at 762. ("impaired property" exclusion did not bar

21  coverage since there was potential physical damage to customers' property resulting from

22  insured's faulty construction of new homes); *see also Hayden*, 141 Wn.2d at 65-66 (interpreting a

23  "loss of use" exclusion to apply only to tangible property not physically injured).

24

1    While the exclusion bars coverage for loss of use, AHM's rip and tear damages caused

2    physical injury to tangible property.  Third party property damage that arises from a defective

3    product can amount to physical injury to tangible property. *Dewitt*, 307 F.3d at 1134 (finding that

4    when another subcontractor's work had to be removed and destroyed because it was damaged by

5    defective installation of concrete piles, it constituted physical injury to tangible property). AHM's

6    work product was "doomed" from the moment it was built around the defective modules. *Baugh*,

7    836 F.2d at 1170.  Since physical damage to AHM's work resulted from Transform's faulty

8    workmanship, the exclusion is not applicable. *Hayden*, 141 Wn.2d at 65-66; *Vanport Homes*, 147

9    Wn.2d at 762.

10    The Court is not persuaded by IH's argument that it was denied an opportunity to

11    investigate the claimed damages, so that it was unable to develop a full defense under the

12    "impaired property" exclusion.  IH contends that, as a result, it was unable to determine if the

13    property could be restored to use by Transform fulfilling the terms of the contract.  This

14    argument is only relevant if the "impaired property" exclusion applies to the rip and tear damages,

15    which it does not. *See Vanport Homes*, 147 Wn.2d at 762; *Hayden*, 141 Wn.2d at 65-66.

16    4.   "Recall of Products" Exclusion

17    IH contends that coverage is barred under Exclusion N, "Recall Of Products, Work Or

18    Impaired Property," which excludes damages resulting from loss of use, repair, replacement,

19    removal, etc., "if such product, work, or property is withdrawn or recalled from the market or

20    from use . . . because of a known or suspected defect." (Dkt. #20-2 at 10). Since exclusionary

21    clauses are strictly construed in favor of finding coverage, Washington courts do not consider

22    "recall" exclusions to bar coverage for third party damage when products are not recalled or

23

24

1   withdrawn from the market. *Yakima Cement*, 22 Wn. App. at 542-44.  There is no contention that

2   the condos were recalled from the market, so the exclusion does not bar coverage. *Id*.[5]

3   **D.  Contract Limitation Period Dispute**

4        Indian Harbor alleges that AHM's state complaint is barred by the contract limitation

5   period. The construction contract between AHM and Transform specifies:

6        **Limitation Period.** Any claim or cause of action by Buyer against Seller . . . must
        be commenced in a court of competent jurisdiction *within 18 months of the date of*
7        *delivery by Seller to Buyer of the goods* which are the subject of the claim or
        cause of action. Any unresolved claim or cause of action which is not timely
8        commenced is waived and released by Buyer. (Dkt. #20-2 at 88, italics added).

9   Tolling commenced at earliest September 5, 2008, when delivery of the goods (modules) began.

10  AHM filed the state suit against Transform on February 24, 2010, within 18 months of

11  September 5, 2008. AHM achieved service of process on Transform within 90 days of filing the

12  complaint. *See* RCW 4.16.170. Accordingly, the state suit was timely commenced. *Id*.

13                              <u>CONCLUSION</u>

14       Having reviewed the relevant pleadings, the declarations and exhibits attached thereto,

15  and the remainder of the record, the Court hereby finds and ORDERS:

16       (1) IH's motion for summary judgment (Dkt. #20) is GRANTED IN PART and DENIED

17  IN PART.  As a matter of law, damage to Transform's finished modules and AHM's materials

18  provided to transform are not covered by the policy.  On the other hand, taking the facts in the

19  light most favorable to AHM, the Court cannot say as a matter of law that IH is not legally

20  obligated to indemnify its insured for rip and tear damages and delay damages.

21  _____

22       [5] The parties do not address whether delay damages are covered or barred under the IH
    insurance policy.  They instead dispute whether delay damages are recoverable based on the
23  construction contract language, which the Court declines to interpret. *See supra* Part IV.B. As a
    result, the Court cannot say as a matter of law that IH is not legally obligated to indemnify its
24  insured for delay damages.

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 15

1    (2)  The Clerk is directed to forward a copy of this order to all counsel of record.

2

3

4    Dated September 8, 2010.

5

6

7                                    RICARDO S. MARTINEZ
8                                    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24